William I. Nash and Marjorie Nash, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 921–71.    Filed June 28, 1973.

*Truman Clare* and *R. David Garber*, for the petitioners.

*Roy S. Fischbeck*, for the respondent.

Sterrett, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income tax as follows:

| Taxable year | Amount |
|---|---|
| 1966 | $3, 867. 05 |
| 1967 | 4, 952. 23 |
| 1968 | 2, 883. 48 |

Due to petitioners' concession, the issues remaining for adjudication are:

(1)  Whether the petitioners are entitled to claim, on their 1966 Federal income tax return, a loss of $6,425 as a result of the demolition of a house acquired by them in June 1966 and razed in December of the same year.

(2)  Whether the gain of $13,718.80 realized by petitioners on the sale of an apartment building in 1967 is taxable as ordinary income or capital gain. Such a determination necessitates a decision relevant to whether petitioners held the above property for sale to customers in the ordinary course of their trade or business within the meaning of sections 1221 and 1231(b) (1) (B).[1]

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

(3) Whether petitioners are entitled to depreciation deductions on certain houses and apartment buildings for the taxable years 1966 through 1968 in the respective amounts of $7,366.10, $9,451.74, and $14,309.15 as claimed, or $2,068, $5,497.92, and $7,996.63 as determined by respondent.[2] A conclusion with respect to this issue requires that we examine (a) the correctness of the basis for depreciation assigned to particular parcels in issue, (b) whether the buildings were held for sale to customers in the ordinary course of business, and (c) whether any of the real property was acquired and held for demolition and, if such be the case, whether this necessitates the disallowances of a depreciation deduction.

(4) Whether petitioners are entitled to a depreciation deduction of $322.58 in 1968 on an automobile.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

William I. Nash (hereinafter petitioner) and Marjorie Nash are husband and wife whose legal residence was Omaha, Nebr., as of the date their petition was filed with the Court. Their joint Federal income tax returns, reflecting the adoption of the cash receipts and disbursements method of accounting, were filed for the calendar years 1966 and 1967 with the district director of internal revenue at Omaha, Nebr., and for the calendar year 1968 with the district director at Kansas City, Mo.

Petitioner is a graduate aeronautical engineer whose major study was structures. From approximately 1948 to 1961 he was employed with the Corps of Engineers as a structural engineer. In 1961 he entered the real estate business as a self-employed individual. Petitioner's Federal income tax returns for the years in issue list his occupation as investor-builder. The schedule entitled "Profit from Business or Profession" (Schedule C) states that his principal business activity is that of a "Builder." Petitioner is not a licensed real estate broker. He invests in the stock market, holding from $50,000 to $200,000 of securities at various times of the year.

In 1954 petitioner purchased property at 3903 Cass Street in Omaha, Nebr. (all street addresses hereinafter referred to are located in Omaha). It cannot be ascertained from the record whether the real estate contained a multifamily dwelling at the time of purchase or whether such was later constructed by petitioner. During the years

---

[2] Respondent allowed a depreciation deduction to the extent of the net rental income produced by the various structures (rental income less other deducted items).

before us petitioner rented the building at a profit and apparently still retains ownership.

On August 20, 1957, petitioner purchased a lot at 4903 Caldwell Street. From November 10, 1961, to June 15, 1962, he constructed a six-unit multifamily dwelling thereon. This apartment was sold by petitioner on June 26, 1962.

Petitioner, on March 28, 1960, purchased a lot at 1302 North 49th Avenue on which he constructed an apartment building. The structure was sold on April 10, 1962. On October 6, 1960, petitioner purchased 1304 North 49th Avenue, the lot immediately adjacent to the above-noted parcel, and in 1964 constructed a multifamily dwelling thereon. Petitioner has retained ownership of this rental property.

On December 30, 1960, petitioner purchased property at 4729 California Street (also described as 515 North 48th Street and lot 7, block 2, Lincoln Place addition to the city of Omaha) on which a 20- by 35-foot framehouse was situated. After renting the structure petitioner acquired a wrecking permit and razed the house on February 23, 1962. A City of Omaha building permit was issued on February 20, 1962, for the construction of an eight-unit apartment. Commencement of construction was extended to August of 1964. After completion of construction petitioner rented the structure until its sale on April 12, 1965, reporting the gain realized on the subsequent sale as ordinary income. In 1969 or 1970 petitioner filed a claim for refund alleging the gain to be capital in nature.

On January 3, 1961, petitioner purchased a parcel of real estate located at 4723 California Street (also referred to as 4725–27 California and lot 6, block 2, Lincoln Place addition to the city of Omaha) on which was located a 20- by 35-foot framehouse. As in the above situation petitioner rented the home for a short period and on February 23, 1962, razed it. After the issuance of a building permit petitioner constructed an eight-unit apartment building. Upon completion of construction (in March 1964) the individual units were offered for rent. Beginning in December of 1964 and extending into 1966, petitioner offered the multifamily dwelling for sale through the local newspaper. The advertisement referred to the property as a "choice investment grossing $895 monthly." The sale was consummated February 11, 1971.

Property located at 3128–30 Chicago Street was next acquired by petitioner on May 5, 1961. It, too, contained a framehouse which was rented until February 23, 1962, at which time petitioner demolished the structure. A building permit was issued and petitioner constructed an 11-unit apartment building. A certificate of occupancy was issued on May 21, 1965, and shortly thereafter the property was advertised

for sale as "a very good investment with over $2,100 positive monthly income." The dwelling was sold January 27, 1966, and petitioner reported the gain as ordinary income.

On September 25, 1961, petitioner purchased a lot at 6628 Pratt Street and constructed thereon a five-unit apartment building, which he offered for rent and ultimately sold on February 20, 1962. Shortly thereafter, on May 10, 1962, petitioner purchased property at 817 North 47th Street and erected a multifamily dwelling. The building was fully rented in the fall of 1963 and was not offered for sale until May 2, 1965. The sale was consummated on March 31, 1966, with petitioner reporting the gain as ordinary income.

Petitioner, on August 9, 1963, next acquired the property at 4801 Underwood Street [3] which contained a 25- by 30-foot framehouse. The purchase price totaled $13,500 of which petitioner allocated $8,750 to the building and the remaining $4,750 to the cost of the land. The dwelling, prior to its destruction in 1966, was rented out. Petitioner's return for 1966 reflects rental income of $285 and expenses of $1,038.34. A wrecking permit was initially issued in July of 1965 and was reissued in October 1966. After demolition, an eight-unit apartment building was constructed with a certificate of occupancy being issued on May 4, 1967. The structure is presently owned and rented by petitioner. The 1967 tax return shows a loss of $799.05 while the 1968 return reflects taxable income of $2,646.19.

Forty-six twenty (4620) Wakeley Street was acquired by petitioner on June 25, 1964. It contained a 22- by 38-foot framehouse built in 1889 and a garage. Wrecking permits were issued for the garage and dwelling on December 2, 1964, and July 20, 1965, respectively. Upon issuance of a building permit petitioner constructed an eight-unit dwelling at a depreciable cost of $56,330.20.[4] A certificate of occupancy was issued April 15, 1966, at which time petitioner offered the apartments for rent. The property was first advertised for sale on or about January 1, 1967. In April and May of the same year it was advertised in conjunction with an adjacent building located at 4702 Wakeley Street which also was held for sale. The property was sold on May 24, 1967, for $71,674. Petitioner's tax return reflects a capital gain of $13,718.80 and ordinary income of $2,534.86.[5]

Two days after the acquisition of 4620 Wakeley Street, on June 29, 1964, petitioner purchased a house at 4702 Wakeley Street. After issuance of the wrecking permit on February 26, 1965, petitioner con-

---

[3] The stipulation indicates the correct address as 4801 Underwood Street. The wrecking and building permits state 4801 Underwood Avenue.

[4] The 1966 tax return indicates a basis for depreciation of $56,330.20. The 1967 return however reflects a basis on the sale of the house of $57,955.20. The difference is unexplained.

[5] Recapture of accelerated depreciation under sec. 1250.

structed an eight-unit apartment complex which was approved for occupancy on April 11, 1966. Approximately 1 month prior to the issuance of the certificate of occupancy petitioner began advertising the building for sale. The advertisements continued until its sale on June 30, 1969. During this same period the apartment units were offered for rent.

On February 14, 1966, petitioner entered into an agreement with Louis Weiner Real Estate Co., which provided that petitioner would purchase the property located at 4619 Wakeley Street subject to the condition that he was also able to acquire title to the adjacent properties at 4615 and 4617 Wakeley Street. Approximately 4 months later on June 2, 1966, petitioner purchased 4615, 4617, and 4619 Wakeley Street. Each contained an old dwelling. The purchase price of 4615 Wakeley Street was $9,092 of which petitioner allocated $5,492 to the house and $3,600 to the cost of the land. Forty-six seventeen (4617) Wakeley Street reflected a price of $10,742, $6,700 to the house and $4,042 to the land. The price of 4619 Wakeley Street was $10,750.

In July and August of 1966 petitioner, through a real estate agent, advertised 4619 Wakeley Street for rent at $75 per month. There is no evidence in the record to indicate that the property was in fact rented. An inspection of the property by City of Omaha officials during this period revealed it to be unfit for human habitation.[6] After notice of the deficiencies was given to petitioner, followed by his failure to abate these conditions, the property was condemned on December 20, 1966. On December 8, 1966, 12 days prior to the condemnation, petitioner obtained a permit to wreck the dwelling located at 4619 Wakeley Street. A demolition loss of $6,425 was claimed by petitioner in his 1966 Federal income tax return.

The homes situated at 4615 and 4617 Wakeley Street were rented by petitioner (at a loss) until August 11, 1969, at which time he acquired two wrecking permits. Upon razing these two dwellings petitioner constructed a 20-unit apartment building on the three lots (4615, 4617, and 4619) whose address was designated 4621–4623 Wakeley Street. It was certified for occupancy April 15, 1970, and rented. Petitioner has thus far retained ownership of this building.

Subsequent to the conditional purchase of 4619 Wakeley Street on February 14, 1966, petitioner on March 22, 1966, purchased a house at 4715 Wakeley Street. The purchase price of $6,623 was allocated $4,303 to the cost of the house and $2,320 to the land. Three days later, on March 25, 1966, petitioner acquired the property at 4719 Wakeley

---

[6] Included within the City's report were the following conditions—inadequate electrical wiring, loose and falling plaster, broken windows, poor plumbing, decayed floors, termite runs, general deterioration, and general structural unsoundness.

on which a single-family dwelling and garage were located. Petitioner allocated the $12,579 purchase price, $9,059 to the building and $3,520 to the cost of the land. From the time of acquisition until the issuance of a wrecking permit on September 25, 1967, the two houses were rented, but the expenses consistently exceeded rental income. Depreciation claimed up to the date of demolition totaled $720.77 and $1,449.50, respectively, computed on the basis of a 15-year life. After destruction of the dwellings petitioner constructed a three-story apartment building, designated as 4717–19 Wakeley Street, consisting of 13 apartment units, four garages, and storage areas. Construction was completed on April 22, 1968. The property was advertised for sale in 1968 as investment property "all leased and producing $19,500 per year." It was sold on July 23, 1969.

On March 31, 1966, petitioner purchased rental property at 527 Park Avenue which he sold in 1966.

Petitioner, on June 24, 1968, purchased a dwelling at 4708 Davenport Street for a total consideration of $17,555. Eleven thousand five hundred and fifty-five dollars ($11,555) was allocated to the cost of the house and the remaining $6,000 to the land. This property was rented in 1968 at a loss. Petitioner has retained ownership of this property.

The following is a summary of the dates of acquisition, issuance of wrecking and building permits, and various times of sales:

| Property | Date acquired | Wrecking permit | Building permit | Certificate of occupancy | Date apartment sold |
|---|---|---|---|---|---|
| 3903 Cass Street | 1954 | | | | Retained ownership |
| 4903 Caldwell Street | 8/20/57 | | 11/10/61 | 6/15/62 | 6/26/62 |
| 1302 North 49th Ave | 3/28/60 | | | | 4/10/62 |
| 1304 North 49th Ave | 10/6/60 | | 1963 | 1964 | Retained ownership |
| 4729 California St | 12/30/60 | 2/23/62 | 2/20/62 | | 4/12/65 |
| 4723 California St | 1/3/61 | 2/23/62 | 2/20/62 | | 2/11/71 |
| 3128-30 Chicago St | 5/5/61 | 2/23/62 | 2/21/62 | 5/21/65 | 1/27/66 |
| 6628 Pratt St | 9/25/61 | | 10/18/61 | | 2/20/62 |
| 817 North 47th St | 5/10/62 | | 1962 | 1963 | 3/31/66 |
| 4801 Underwood St | 8/9/63 | {7/20/65, 10/6/66} | {7/28/65, 10/6/66} | 5/4/67 | Retained ownership |
| 4620 Wakeley St | 6/27/64 | {12/2/64, 7/20/65} | 7/28/65 | 4/15/66 | 5/24/67 |
| 4702 Wakeley St | 6/29/64 | 2/26/65 | 6/10/65 | 4/11/66 | 6/30/69 |
| 4715 Wakeley St.[1] / 4719 Wakeley St | 3/22/66 / 3/25/66 | 9/25/67 | 8/4/67 | 4/22/68 | 7/23/69 |
| 527 Park Ave | 3/31/66 | | | | 1966 |
| 4615 Wakeley St.[2] | 6/2/66 | 8/11/69 | | | |
| 4617 Wakeley St | 6/2/66 | 8/11/69 | 3/25/69 | 4/15/70 | Retained ownership |
| 4619 Wakeley St | 6/2/66 | 12/8/66 | | | |
| 4708 Davenport St | 6/24/68 | | | | Retained ownership |

[1] One apartment building was constructed on the two lots referred to as 4717–19 Wakeley St.
[2] One apartment building was constructed on the three lots referred to as 4621–4623 Wakeley St.

During the years in issue the petitioner reported on his Federal income tax returns the following amounts of net rental income and losses:

| Property | 1966 | 1967 | 1968 |
|---|---|---|---|
| 3903 Cass St. (apartment) | $2,188.61 | $1,811.03 | $2,140.15 |
| 1304 N. 49th Ave. (apartment) | (1,305.45) | (327.95) | 2,109.89 |
| 4725-27 California St. (apartment) | 833.27 | 827.74 | 664.22 |
| 3128-30 Chicago St. (apartment) | 601.00 | | |
| 817 North 47th St. (apartment) | 619.00 | | |
| 4801 Underwood St. (house) | (753.34) | | |
| 4801 Underwood St. (apartment) | | (799.05) | 2,646.19 |
| 4620 Wakeley St. (apartment) | (2,920.86) | 2,356.00 | |
| 4702 Wakeley St. (apartment) | 1,147.96 | 2,745.92 | 1,861.72 |
| 4715 Wakeley St. (house) | (274.74) | (814.03) | |
| 4719 Wakeley St. (house) | (203.00) | (841.50) | |
| 4717-19 Wakeley St. (apartment) | | | (4,148.69) |
| 527 Park Avenue (house) | 195.00 | | |
| 4615 Wakeley St. (house) | (627.39) | (562.16) | (412.45) |
| 4617 Wakeley St. (house) | (382.81) | (637.92) | (266.83) |
| 4708 Davenport St. (house) | | | (917.75) |
| Management fee | | | (4,160.00) |

With regard to the houses acquired prior to wrecking, petitioner applied a 150-percent declining-balance method of depreciation with a 15-year life and no salvage value. The depreciation claimed and remaining bases of two houses (prior to wrecking) whose bases on construction of the subsequent apartment are in issue may be reflected as follows:

| House | Depreciation claimed | Remaining basis |
|---|---|---|
| 4801 Underwood | $1,945.39 | $6,804.61 |
| 4715 Wakeley | 720.77 | 3,582.23 |
| 4719 Wakeley | 1,449.50 | 7,609.50 |

The depreciation and basis of the third house, 4702 Wakeley, prior to wrecking cannot be ascertained from the record.

The bases and depreciation claimed by petitioner during the years in issue and respondent's adjustments with regard solely to properties in issue may be reflected as follows:

| Property | Basis [1] | | 1966 depreciation [2] | | 1967 depreciation | | 1968 depreciation | |
|---|---|---|---|---|---|---|---|---|
| | Claimed | Allowed | Claimed | Allowed | Claimed | Allowed | Claimed | Allowed |
| 4801 Underwood St. (house) | $8,750.00 | | $494.34 | | | | | |
| 4801 Underwood St. (apartment) | 54,557.61 | $47,318.66 | | | $3,547.05 | $2,748.00 | $3,126.15 | $2,732.66 |
| 4620 Wakeley St. (apartment) | 56,330.20 | | 2,594.86 | | | | | |
| 4702 Wakeley St. (apartment) | 61,310.27 | 51,780.00 | 2,768.96 | $1,611 | 3,513.08 | 2,745.92 | 3,302.28 | 2,788.97 |
| 4715 Wakeley St. (house) | 4,303.00 | | 322.74 | 48 | 398.03 | | | |
| 4719 Wakeley St. (house) | 9,059.00 | | 604.00 | 401 | 345.50 | 4.00 | | |
| 4717-19 Wakeley St. (apartment) | 91,449.73 | 80,258.00 | | | | | 6,269.69 | 2,121.00 |
| 4615 Wakeley St. (house) | 5,492.00 | | 320.39 | | 517.16 | | 465.45 | 53.00 |
| 4617 Wakeley St. (house) | 6,700.00 | | 390.81 | 8 | 630.92 | | 567.83 | 301.00 |
| 4708 Davenport St. (house) | 11,555.00 | | | | | | 577.75 | |
| Total | | | 7,366.10 | 2,068 | 9,451.74 | 5,497.92 | 14,309.15 | 7,996.63 |
| | | | 2,068.00 | | 5,497.92 | | 7,996.63 | |
| | | | 5,208.10 | | 3,953.82 | | 6,312.52 | |

[1] Bases of depreciable property only (excluding land).
[2] The depreciation allowed is limited to the extent of net rental income (excluding depreciation).

During the years in issue petitioner kept no books or records specifically identifying properties held for sale and for investment. The records maintained by petitioner consisted of canceled checks, schedules of apartment units showing names of tenants, and annual summaries.

During 1968 petitioner owned a 1963 Chevrolet automobile which he used for both business and personal use. In the fall of 1968 petitioner sold the "Chevy" and purchased a new 1969 Ford LTD. In his 1968 return petitioner claimed the following expense:

Auto—6,720 mi. 10¢=$672.00
New Auto—1,900 mi. in '68=$137.25

In addition he claimed a depreciation deduction of $322.58 on the Ford.

The notice of deficiency mailed to the petitioner was dated November 16, 1970. It disallowed the condemnation loss of $6,425 deducted by the petitioner on his 1966 return with regard to the house located at 4619 Wakeley Street. It further determined that the gain realized on the sale of 4620 Wakeley Street was taxable as ordinary income and not capital gain since, argues respondent, such property was held for sale to customers in the ordinary course of business. The notice of deficiency reduced the depreciable basis of the apartment units located at 4717–19 Wakeley Street, 4801 Underwood Street, and 4702 Wakeley Street and it disallowed all or part of the depreciation deductions claimed by petitioner on the single and multifamily dwellings noted at page 510 *supra* on the grounds that they were either held for sale or acquired solely to demolish.

On December 14, 1969, and January 2, 1970, the petitioner and respondent respectively executed a written agreement pursuant to the provisions of section 6501(c)(4) extending the period for the assessment of tax for the taxable year 1966 to December 31, 1970.

OPINION

Before directing ourselves to the enumerated issues set out above, we are first required to determine whether the taxable year ended December 31, 1966, is barred by the statute of limitations. Petitioner in his petition asserts that the notice of deficiency was issued subsequent to the expiration of the statute of limitations. Specifically he notes that the statutory notice for all years in issue was dated November 16, 1970, which, argues petitioner, is clearly beyond the 3-year statutory period as provided in section 6501(a). Respondent however introduced a Form 872, "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax," executed by the petitioner and respondent on December 14, 1969, and January 2, 1970, respectively

(prior to the running of the statutory period), which, as permitted in section 6501(c)(4), extended the applicable period for issuance of the notice of deficiency to December 31, 1970. The statutory notice is therefore timely.

The first issue presented for our determination relates to whether the petitioner is entitled to a $6,425 loss, claimed on his 1966 Federal income tax return, as a result of the demolition of a building located at 4619 Wakeley Street.

Section 165(a) permits as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c) (excluding casualty losses) limits the deduction permitted to an individual to those incurred in a trade or business or a transaction entered into for profit.

The regulations at 1.165-3(a)(1) and (b)(1), referring specifically to demolition losses, provide in substance that if real property is acquired (in the course of business or in a transaction entered into for profit) with the intention of demolishing the building situated thereon no deduction shall be allowed on account of the demolition.[7] However, if no such intent exists at the time of acquisition, but is formed subsequently, the loss incurred at the time of demolition will be deductible to the extent of the building's adjusted basis plus costs of demolition.[8] These regulations have been quoted and expounded upon in numerous judicial decisions. In *Panhandle State Bank*, 39 T.C. 813, 816-817 (1963), this Court stated:

If, at the date of purchase, there was no intent to demolish the building, an allocation of purchase price between the building and the land is proper and the loss incurred in the subsequent demolition of the building is an allowable loss. *Jack M. Chesbro*, 21 T.C. 123 (1953), affirmed per curiam 225 F. 2d 674 (1955), certiorari denied 350 U.S. 995 (1956). If a change in circumstances makes the building unsuitable for its intended use the purchaser is entitled to a demolition loss in the year of demolition equal to the adjusted basis of the building

---

[7] Sec. 1.165-3 Demolition of buildings.

(a) *Intent to demolish formed at time of purchase.*—(1) * * * when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a) on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition.

[8] Sec. 1.165-3(b). *Intent to demolish formed subsequent to time of the acquisition.*—(1) * * *, the loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. See paragraph (c) of § 1.165-1 relating to amount deductible under section 165. The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished.

decreased by the net salvage, cf. *William Heyman,* 6 T.C. 799 (1946), and Income Tax Regs., sec. 1.165–3(b).

Several years earlier in *Lynchburg National Bank & Trust Co.,* 20 T.C. 670, 673–674 (1953), affd. 208 F. 2d 757 (C.A. 4, 1953), we noted:

Where, as here, there is a purchase of land with the intent to demolish a building situated thereon and erect a new one, no part of the price paid is allocable to the building, since it is deemed that the building has no value to the purchaser and it is the land which is purchased and which alone has value. The entire purchase price, therefore, represents the cost of the land and becomes the purchaser's basis. *N. W. Ayer & Son, Inc.,* 17 T.C. 631. The fact that a certain value was placed on the building at the time of purchase, that the buildings were rented and rent collected, and depreciation claimed is deemed immaterial. The original intention is the determining factor. * * *

Finally in *Meyer v. United States,* 247 F. Supp. 939, 944 (D. Mass. 1965), affirmed per curiam 362 F. 2d 264 (C.A. 1, 1966), the District Court noted:

As used in Treasury Regulations § 1.165–3, the phrase "with the intention of demolishing either immediately or subsequently the buildings situated thereon" should be interpreted as though it read "with the *dominant* intention." Rarely does a man have an intention which he is not prepared to yield to circumstances. What a draftsman of regulations implies when he uses word "intention" is an intention or purpose to be followed under circumstances which are foreseen as more probable than not.

It is clear, then, that the purchaser's intent at the time of acquisition is of controlling importance. This is a question of fact. *Adolph B. Canelo III,* 53 T.C. 217 (1969), affirmed per curiam on another issue 447 F. 2d 484 (C.A. 9, 1971). The regulations at 1.165–3(c) list a series of factors to assist in making the necessary determination.[9] Ap-

---

[9] Sec. 1.165–3(c)(2). An intention at the time of acquisition to demolish may be suggested by:

(i) A short delay between the date of acquisition and the date of demolition;

(ii) Evidence of prohibitive remodeling costs determined at the time of acquisition;

(iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes;

(iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or

(v) Inability at the time of acquisition to realize a reasonable income from the buildings.

(3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by:

(i) Substantial improvement of the buildings immediately after their acquisition;

(ii) Prolonged use of the buildings for business purposes after their acquisition;

(iii) Suitability of the buildings for investment purposes at the time of acquisition;

(iv) Substantial change in economic or business conditions after the date of acquisition;

(v) Loss of useful value occurring after the date of acquisition;

(vi) Substantial damage to the buildings occurring after their acquisition;

(vii) Discovery of latent structural defects in the buildings after their acquisition;

(viii) Decline in the taxpayer's business after the date of acquisition;

(ix) Condemnation of the property by municipal authorities after the date of acquisition; or

(x) Inability after acquisition to obtain building material necessary for the improvement of the property.

plying these tests along with the various guidelines enunciated in case law it is our conclusion that the dominant intent to demolish clearly existed at the time of purchase.

The house at the time of acquisition was 77 years old. It was dilapidated, generally deteriorated, and structurally unsound, needing extensive repairs costing in the vicinity of $3,500 (which petitioner could not justify spending under any circumstances). Petitioner had knowledge of these conditions prior to purchase and, with his obvious expertise as a structural engineer, clearly must have recognized the uninhabitability of the house. This is further supported by the City of Omaha's letter issued shortly after the petitioner acquired the property which noted that the house was in such poor condition as not to be usable for human occupancy.

The record further demonstrates (as will be discussed *infra*) that petitioner's principal business activity consisted of the construction and sale of multifamily housing units. He carried out this mode of livelihood by buying old houses, destroying them, and constructing in their place apartment buildings which in most instances were sold. The house at 4619 Wakeley Street was no different. In February of 1966, 4 months prior to the acquisition, petitioner entered into an agreement to buy the property in question on the condition that he also obtain the right to secure the two adjacent parcels at 4615 and 4617 Wakeley Street. On June 2, 1966, he purchased the three lots and on December 8 of the same year a wrecking permit was issued for the 4619 Wakeley Street home. In March of 1969 petitioner obtained a building permit and shortly thereafter wrecked the two adjacent buildings and constructed a 20-unit multifamily dwelling on the three parcels.

Petitioner asserts however that his intention at the time of acquisition was to rent and his plans were changed solely because of the condemnation. He supported this contention by introducing newspaper ads advertising the building for rent at $75 a month.

We find petitioner's contentions unconvincing. First, as the regulations and case law point out, the renting of property will not permit a loss on demolition if the party had the intent to demolish at the time of acquisition. Here we do not even have a rental but merely the supposed intention to rent. Further, as the Court of Appeals for the Fifth Circuit in *United States* v. *Ivey*, 294 F. 2d 799, 807 (C.A. 5, 1961), noted when discussing the taxpayer's intention to rent: "The jury might reasonably infer that the taxpayer would not have purchased the property with the expectation of holding it for rental at such a low return." Keeping in mind the earlier discussion, the supposed intention to rent at $75 a month does not convince us that petitioner

had any other motive in acquiring the property than its ultimate demolition.

While the condemnation by the City would normally bolster petitioner's position, in this particular situation it tends to detract from it. The City's representatives notified petitioner of the dwelling's condition in August of 1966 (2 months after acquisition) indicating in their letter that they had previously inspected the building and found it uninhabitable. They requested the petitioner to improve the situation or they would condemn the building. The petitioner did nothing to improve the structure's condition, but rather obtained a permit to wreck the building 2 weeks prior to the issuance of the condemnation order.

On the evidence presented we conclude that petitioner acquired the property with the intention to demolish and therefore is not entitled to a loss deduction.

Turning to the second issue, respondent asserts that the gain realized by the petitioner on the sale of the apartment unit at 4620 Wakeley Street should be taxable at ordinary-income rates because, urges respondent, petitioner held such property primarily for sale to customers in the ordinary course of business. Petitioner, to the contrary, maintains that the property was constructed and held for the production of rental income and therefore the character of the realized gain is governed by the language of section 1231, i.e. capital gain.

Section 1221(1) excludes from the capital asset category property held primarily for sale to customers in the ordinary course of business. Section 1231, while extending capital asset treatment on gain to certain property otherwise excluded by section 1221, likewise denies the favored treatment to property falling within this particular exclusion. Thus, simply stated, the issue is whether the 4620 Wakeley Street property was held by the petitioner primarily for sale to customers in the ordinary course of petitioner's business.

Primarily means "of first importance" or "principally." *Malat* v. *Riddell*, 383 U.S. 569 (1966). "For sale to customers" refers simply to the intention to sell and "in the ordinary course of business" contemplates "the taxpayer * * * [being] in a business of which the sale is a part * * * [and] it must also be in the 'ordinary course' of the business." *S. O. Bynum*, 46 T.C. 295, 302 (1966) (concurring opinion). Such is a question of fact to be determined from all the relevant facts and circumstances. *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960). "The burden of proof, to establish the negative of this proposition, is on petitioner, and we recognize, as we must, that the capital gain provisions, being an exception to the normal-tax rates, are to be construed narrowly. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955)." *S. O. Bynum*, 46 T.C. at 298.

It is the decision of this Court that the petitioner has failed to demonstrate the inapplicability of the section 1221(1) exception here in issue. Rather, the facts clearly reflect the petitioner's intention to hold the property for sale in the normal course of his business. As petitioner's returns indicate, his main business activity was as a builder. Commencing in approximately 1960 petitioner followed a pattern of buying single-family dwellings, razing the structures, and constructing on the vacant land multifamily apartment buildings which he, in most instances, attempted to sell. Specifically the record indicates that during this period petitioner acquired at least 17 parcels of land, most of which contained single-family homes, which he razed, built thereon 11 multifamily dwellings,[10] and sold 10 of them.

The property at 4620 Wakeley Street was no exception. Petitioner purchased it on June 27, 1964. Wrecking permits were issued for the garage and dwelling on December 2, 1964, and July 20, 1965, respectively. A certificate of occupancy for the new structure was issued April 15, 1966; it was advertised for sale commencing in January of 1967 and extending into May of the same year, at which time, on May 24, 1967, it was sold.

We recognize, as petitioner points out, that both the houses, prior to being razed, and the buildings, before sale, were rented. This however does not alter the result reached herein. With one exception, every house, including 4620 Wakeley Street, produced a loss during the years before demolition, which further supports our conclusion that they were acquired only as the first link in the chain leading to the construction and sale of multifamily dwellings. As to the rental of the apartment units, the facts demonstrate that it was the petitioner's consistent practice to rent the structures prior to sale. In this way he apparently felt he could demand a greater selling price. For example, the advertisement for sale of the building located at 3128–30 Chicago Street stated, "a very good investment with over $2,100 positive monthly income." Thus the rental merely assisted him in reaching his goal of selling the various parcels of real estate. This is further substantiated by the fact that for the taxable years ended 1966–68, the years before us, petitioner's income tax returns reflect net rental income of $882.75, $3,758,08, and $483.55, respectively. Such is not indicative of a rental real estate business.

The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand (*Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. (*Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134.) [*Malat* v. *Riddell*, 383 U.S. at 572.]

---

[10] Several of the parcels were combined in the construction of one apartment building.

Clearly the gain realized on the sale of 4620 Wakeley Street arises from the petitioner's everyday operation of his business.

We are next required to determine whether, and if so, to what extent, the depreciation deductions claimed by petitioner with regard to the various single-family dwellings and apartment units were proper. This necessitates an examination of three separate questions.

Turning to the first question, respondent contends that the homes [11] were acquired with the intention to demolish and therefore the depreciation deductions claimed prior to demolition must be disallowed to the extent such depreciation exceeds net rental income. Petitioner again asserts that the intent to demolish was fixed after acquisition thereby permitting a "normal" depreciation deduction.

The single-family homes were acquired with the intention to demolish. As we concluded previously, petitioner was in the business of building and selling apartment units. He acquired 13 single-family dwellings, sold one in the year acquired, retained ownership of one, and demolished the remaining 11. Few, if any, improvements were made to the houses between the time of acquisition and their destruction. While the homes were all rented (except 4619 Wakeley Street) prior to demolition, every house but one (which was sold in the year acquired) produced a loss. And as we noted earlier, "The fact that a certain value was placed on the building at the time of purchase, that the *buildings were rented and rent collected,* and depreciation claimed is deemed immaterial. The original intention is the determining factor." (Emphasis supplied.) *Lynchburg National Bank & Trust Co.,* 20 T.C. at 673–674. *Hillside National Bank,* 35 T.C. 879 (1961); *United States* v. *Ivey,* 294 F. 2d 799 (C.A. 5, 1961); *Panhandle State Bank,* 39 T.C. 813 (1963).

Having determined that the structures were acquired with the intention to demolish [12] we must now decide, as respondent contends, whether the allowable depreciation is limited to the extent of net rental income.[13] (Gross rents less expenses other than depreciation.) While we can find no case law precisely on point the regulations at 1.165–3(a)(2)(i) face the issue squarely. It states:

(2)(i) If the property is purchased with the intention of demolishing the buildings and the buildings are used in a trade or business or held for the

---

[11] The homes include 4801 Underwood Street, 4715 Wakeley Street, 4719 Wakeley Street, 4615 Wakeley Street, 4617 Wakeley Street, and 4708 Davenport Street.

[12] It is our conclusion that 4708 Davenport Street was also acquired with the intent to demolish, though it had not yet been destroyed at time of trial. The property was acquired in June of 1968, the last year in issue. Petitioner reported a $917 loss for the first ½ year held. It, like the other homes, had a relatively low-cost basis. Combining these facts with the clear pattern demonstrated above we are compelled to hold for the respondent.

[13] Had the property not been rented there would be no depreciation deductions because there would be no basis to depreciate—cost allocated solely to the land. *Lynchburg National Bank & Trust Co.,* 20 T.C. 670 (1953).

production of income before their demolition, a portion of the basis of the property may be allocated to such buildings and depreciated over the period during which they are so used or held. * * * the portion of the purchase price which may be allocated to the buildings shall not exceed the present value of the right to receive rentals from the buildings over the period of their intended use. The present value of such right shall be determined at the time that the buildings are first used in the trade or business or first held for the production of income. * * *

However, compare *Mechanics & Merchants Bank* v. *United States*, 164 F. Supp. 246 (Ct. Cl. 1958), and *Lynchburg National Bank & Trust Co.*, *supra*, promulgated prior to the above-quoted regulations.[14]

We find these regulations to be both logical and reasonable. To completely deny a depreciation deduction would be in essence a tax on gross income. To permit depreciation regardless of the properties' estimated anticipated income would be to create a basis for property which we initially determined to have no basis, since the purchase of land with the intent to demolish a building is in essence solely the purchase of the land. What the regulations are attempting to do is fit within these two extremes through the creation of an exception to their own provisions by assigning a limited basis to the building permitting a depreciation deduction to the extent of anticipated income. This prevents undue hardship to the taxpayer on the one hand and attempts to prevent tax avoidance through excessive depreciation deductions on the other. We therefore uphold respondent's partial disallowance of the claimed depreciation deductions.

The second of the three questions relates to the depreciable bases assignable to three of the constructed apartment buildings.[15] Petitioner has in essence added to the cost of the apartment units the undepreciated cost at the time of demolition of the single-family homes.[16] Respondent, once again relying on the regulations at 1.165–3 (a) (3), which states:

(3) The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property originally purchased even though such part was, at the time of purchase, allocated to the buildings to be demolished for purposes of determining allowable depreciation for the period before demolition.

disallows the added basis factor.

We hold for the respondent. As we have pointed out previously, if land is purchased with the intent to demolish a building situated

---

[14] Prior to the adoption of sec. 1.165–3(a)(2)(i) in 1960 the respondent maintained the position that if property was acquired with the intent to demolish it had no basis and therefore was not depreciable whether it produced income prior to demolition or not.

[15] The buildings in issue are 4801 Underwood Street, 4702 Wakeley Street, and 4717–19 Wakeley Street.

[16] For purposes of clarity we note that the undepreciated basis carried over by petitioner refers to the basis initially allocated by petitioner on the properties' acquisition. Since we have previously concluded that the homes were acquired with the intent to demolish, the buildings had no depreciable bases except to the extent assignable to cover anticipated rentals prior to demolition. See fn. 17 *infra*.

thereon, the purchase price is allocated to the land since it is deemed that the building had no value. Thus there is no basis to carry over. *Lynchburg National Bank & Trust* Co., 20 T.C. 670 (1953). To the extent the building is rented prior to destruction an estimated basis is assigned. However, as the regulations point out, "any portion of the basis of the buildings which has not been recovered through depreciation * * * at the time of the demolition of the buildings is allowable as a deduction under section 165." Sec. 1.165–3(a)(2)(ii), Income Tax Regs.[17] Therefore under no circumstances would there be a carryover basis.[18]

The third and final question concerns the respondent's partial disallowance of depreciation deductions (in excess of net rental income) allocable to several of the apartment buildings [19] on the theory that they were held primarily for sale in the ordinary course of business.

It is fundamental that property subject to the provisions of section 1221(1)[20] is not depreciable property. *Luhring Motor Co.*, 42 T.C. 732 (1964); *Duval Motor Co.*, 28 T.C. 42, affd. 264 F. 2d 548 (C.A. 5, 1959); sec. 1.167(a)–2, Income Tax Regs. Previously we concluded that petitioner was in the business of building and selling apartment buildings. However it is well settled that while a person may be in the business of selling a particular product, he can at the same time hold a similar product for investment purposes. See sec. 1236; *William B. Howell*, 57 T.C. 546, 557 (1972). Due to the retention of the property, the length of time held, the lack of advertising for sale, and the rental income produced during 1968, it is our conclusion that the apartment building at 4801 Underwood Street qualifies as investment property. We uphold respondent's disallowance with respect to the other parcels.

---

[17] In the instant case no problem of excessive estimated basis is presented since the respondent, through hindsight in his notice of deficiency, assigned the property a basis equivalent to its rental income.

[18] The regulations at 1.165–3(b) note that even if the intention to demolish is formed subsequent to acquisition the undepreciated basis remaining after demolition does not carry over but is deductible as a condemnation loss. However compare *A. Raymond Jones*, 25 T.C. 1100 (1956), reversed on another issue 259 F. 2d 300 (C.A. 5, 1958); *Henry Phipps Estates*, 5 T.C. 964 (1945); and others wherein the intent to demolish was formed *subsequent* to the buildings' acquisition yet the court denied a demolition loss and required the carryover of the unrecovered loss to the new building, reasoning that it was an "open transaction," i.e. the old building would not have been destroyed without the intent to construct a new one. Note however these cases deal with the intent to demolish formed after acquisition, i.e. the building had a value, while in the instant case the intent to demolish was formed at the time of acquisition.

[19] They include 4801 Underwood Street, 4717–19 Wakeley Street, 4702 Wakeley Street, and 4620 Wakeley Street.

[20] SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *.

The fourth and final issue relates to whether petitioner is entitled to a depreciation deduction on an automobile. In the fall of 1968 petitioner acquired a new 1969 Ford automobile which he used in his business. On his Federal income tax return for the year ended 1968 he deducted automobile expenses based on mileage and in addition claimed a depreciation deduction. Respondent disallowed the claimed depreciation.

We hold for the respondent. Petitioner is entitled to only one deduction. He chose an optional method of computing automobile expenses based on a mileage rate. This deduction is in lieu of an itemized list of expenses including depreciation. Since petitioner chose the optional method he is not entitled to a depreciation deduction.

*Decision will be entered under Rule 50.*